[900 NE2d 136, 871 NYS2d 599]

In the Matter of the Estate of ABRAHAM XX., Deceased. KATH-LEEN XX., as Administrator of the Estate of ABRAHAM XX., Deceased, Appellant; STATE OF NEW YORK, Respondent.

Argued October 14, 2008; decided November 20, 2008

**POINTS OF COUNSEL**

*Hinman, Howard & Kattell, LLP,* Binghamton (*James M. Hayes* and *Amy Shapiro* of counsel), for appellant. I. The State of New York is only entitled to recover medical assistance provided to Abraham XX. after establishment of the supplemental needs trust. (*Arkansas Dept. of Health & Human Servs. v Ahlborn,* 547 US 268.) II. Federal and state prohibitions against recovery of correctly paid Medicaid apply. (*Matter of Melendez v Wing,* 8 NY3d 598; *Arkansas Dept. of Health & Human Servs. v Ahlborn,* 547 US 268; *Human Dev. Servs. of Port Chester v Zoning Bd. of Appeals of Vil. of Port Chester,* 67 NY2d 702; *Matter of Dumbleton v Reed,* 40 NY2d 586; *Gold v United Health Servs.*

*Hosps.*, 95 NY2d 683.) III. The Appellate Division erred in finding that the trust itself provides the State of New York recovery of pre-trust Medicaid—the trust provides for recovery of only what is required by law. (*Pocket Books, Inc. v Meyers*, 292 NY 58.) IV. The word "total" in the supplemental needs trust statute refers to all Medicaid for which the trust formed the basis of eligibility. (*People v Mobil Oil Corp.*, 48 NY2d 192; *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler*, 537 US 371; *Matter of Sutka v Conners*, 73 NY2d 395; *Matter of Town of Brookhaven v New York State Bd. of Equalization & Assessment*, 88 NY2d 354; *Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation*, 71 NY2d 186; *Cricchio v Pennisi*, 90 NY2d 296; *Sullivan v County of Suffolk*, 174 F3d 282, 528 US 950; *Cook County v United States ex rel. Chandler*, 538 US 119; *Traynor v Turnage*, 485 US 535; *Matter of Mills v Durst*, 156 Misc 2d 676.) V. Court approval of the State of New York's lien for pre-trust Medicaid is res judicata contrary to the holding below, and therefore bars any recovery for that Medicaid from the trust remainder. (*Arkansas Dept. of Health & Human Servs. v Ahlborn*, 547 US 268; *Gold v United Health Servs. Hosps.*, 95 NY2d 683; *Matter of Hunter*, 4 NY3d 260; *Smith v Russell Sage Coll.*, 54 NY2d 185; *D'Arata v New York Cent. Mut. Fire Ins. Co.*, 76 NY2d 659; *Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65; *Israel v Wood Dolson Co.*, 1 NY2d 116; *Brown v Spohr*, 180 NY 201.) VI. Interest should be awarded from the date funds were paid to the State of New York. (*Spodek v Park Prop. Dev. Assoc.*, 96 NY2d 577; *Lawyers' Fund for Client Protection of State of N.Y. v Bank Leumi Trust Co. of N.Y.*, 94 NY2d 398.)

*Andrew M. Cuomo, Attorney General*, Albany (*Kathleen M. Treasure, Barbard D. Underwood* and *Nancy A. Spiegel* of counsel), for respondent. I. The State of New York properly received an amount equal to its total Medicaid expenditures pursuant to its remainder interest in the supplemental needs trust and the statutes governing it. (*Matter of Hubbell*, 302 NY 246; *Arkansas Dept. of Health & Human Servs. v Ahlborn*, 547 US 268; *Gold v United Health Servs. Hosps.*, 95 NY2d 683; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382; *Seittelman v Sabol*, 91 NY2d 618; *Doe v State of New York*, 11 AD3d 579; *National Org. for Women v Metropolitan Life Ins. Co.*, 131 AD2d 356; *Cricchio v Pennisi*, 90 NY2d 296; *Sullivan v County of Suffolk*, 174 F3d 282.) II. Res judicata does not bar any portion of the State of New York's remainder interest. (*Matter of Hunter*, 4 NY3d 260; *Matter of City of Lackawanna*, 45

AD2d 1; *Amo v Little Rapids Corp.*, 100 NY2d 531; *Jobco, Inc. v County of Nassau,* 129 AD2d 614.) III. Petitioner is not entitled to predecision interest. (*Matter of Bello v Roswell Park Cancer Inst.,* 5 NY3d 170; *Matter of Meloni v Goord,* 267 AD2d 977; *Brown v State of New York,* 89 NY2d 172; *Sharapata v Town of Islip,* 56 NY2d 332; *Krohn v New York City Police Dept.,* 2 NY3d 329; *Matter of Lehigh Val. R.R. Co. v Joseph,* 281 App Div 57, 305 NY 853.)

## OPINION OF THE COURT

Chief Judge KAYE.

At issue in this appeal is the scope of the State's right to reimbursement for Medicaid payments made on behalf of an infant pursuant to the terms of a supplemental needs trust established in accordance with state and federal law. The question is whether the State can recover its remainder interest in an amount equal to the "total medical assistance paid" on behalf of the recipient, or whether the State is limited to the amount expended from the trust's effective date to the recipient's death. We hold that the State can recover the entire amount paid from any remaining trust assets.

## Background

Kathleen XX. suffered a grand mal seizure during pregnancy and delivered her son, Abraham, prematurely by emergency cesarean section on July 28, 1992. As a result, Abraham suffered from spastic quadriplegic cerebral palsy. He entered custodial care at the Broome Developmental Center (operated by the State Office of Mental Retardation and Developmental Disability [OMRDD]) in 1994, and the State assumed the costs of Abraham's room and care through the Medicaid program.[1] Kathleen litigated a successful malpractice suit on Abraham's behalf against her physicians and the hospital. Prior to a $103 million jury verdict, the action settled for $5 million pursuant to a high-low agreement. The State filed a lien for $1,707,884.95 against the proceeds of Abraham's settlement, representing the Medicaid costs paid from his entry into custodial care through the date of the jury's verdict on March 23, 1998 (*see* Social Services Law § 104-b). The State has received full payment of its lien and it is not at issue here.

Payment of the settlement was delayed due to the parties' dispute regarding allocation of the proceeds. Abraham remained

---

1. The daily cost of room and care when Abraham entered the Broome Center was $828.42. It rose to $2,164.59 during his six years at the facility.

in care during this time, and the State continued to pay his Medicaid costs until a $2.17 million lump-sum settlement payment made him Medicaid-ineligible. After years of litigation and an appeal to this Court (*see Gold v United Health Servs. Hosps.*, 95 NY2d 683 [2001]) the $2.17 million was retroactively placed in a supplemental needs trust (SNT) created on Abraham's behalf, thereby reviving his Medicaid eligibility. As a result, there exists a gap between the date of the jury's verdict (also the expiration date of the State's Medicaid lien)—March 23, 1998—and the date the SNT was funded—September 12, 1999.[2] Reimbursement for Medicaid payments made during this gap is the issue before us.

Abraham died on June 11, 2003, just shy of his 11th birthday. The SNT Agreement provides that upon Abraham's death, the trustees must pay the State

> "to the extent then required by law . . . such amount as shall be necessary to provide reimbursement for expenditures made for medical assistance for Abraham [XX.] . . . through Medicaid . . . and the balance, if any remains, shall be paid to the personal representative of the estate of Abraham [XX.]."

Accordingly, the State filed a verified claim against the trust for just over $1.5 million for Medicaid payments made on Abraham's behalf from March 24, 1998 through the date of his discharge from the Broome Center in October 2001. Kathleen stipulated to payment of the claim, reserving the right to seek a refund. The State alleges that after payment of its claim, there remained approximately $285,000 in the trust plus title to a home purchased for Abraham.

As relevant to this appeal, Kathleen then petitioned for repayment by the State of $961,810.89, representing the "Gap Medicaid" paid from March 24, 1998 to September 12, 1999. She argued that the State was precluded from recovering funds in excess of its Medicaid lien based on res judicata. Supreme Court agreed in part and ordered a partial refund.

The Appellate Division modified Supreme Court's order, reversed the partial refund and granted the State's motion for summary judgment, reasoning that the State's right to reim-

---

**2.** The precise dates of this gap vary by a few days throughout the record. We have adopted the dates utilized by both parties in their briefs to this Court.

bursement derives from the terms of the trust agreement, which designates the State as the primary remainderman. Because Kathleen "elected to avail Abraham of the eligibility benefits of an SNT, [she] is now bound by the terms of the trust agreement to reimburse [the State] for all Medicaid expended on Abraham's behalf" (36 AD3d 1085, 1089 [3d Dept 2007]). The court also held that res judicata did not apply to the facts of this case.

On appeal to this Court, Kathleen solely disputes the State's right to reimbursement for the period from March 24, 1998 (the day after the malpractice suit's jury verdict) through September 12, 1999 (the day the SNT was funded).[3] She concedes that the State is entitled to retain its recovery of Medicaid payments made after the SNT was funded.

## Analysis

A supplemental needs trust is a planning tool used to shelter a severely disabled person's assets for the dual purpose of securing or maintaining eligibility for state-funded services, and enhancing the disabled person's quality of life with supplemental care paid by his or her trust assets.

In New York, the SNT—though not so named at the time—originated in a 1978 Surrogate's Court decision in which the court prevented the State from invading the principal of a testamentary trust created by a father for the lifetime benefit of his severely disabled daughter (*Matter of Escher*, 94 Misc 2d 952 [1978], *affd* 75 AD2d 531 [1st Dept 1980], *affd* 52 NY2d 1006 [1981]). The decision introduced the concept of using a discretionary trust to supplement the care of severely disabled individuals without jeopardizing the individual's right to government-provided medical care during the beneficiary's lifetime (*see* Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 7-1.12, at 319). A widely-used planning device among parents of disabled children, in 1993 the Legislature codified the SNT in order to provide clarity and uniformity in the law (*see* EPTL 7-1.12, as added by L 1993, ch 433, § 5).

In the same year that New York State codified the SNT, the United States Congress enacted the Omnibus Budget Reconcili-

---

**3.** The Appellate Division had remitted to Supreme Court for fact-finding with respect to Kathleen's additional claim to a refund of $34,633.64, representing Medicaid paid from October 16, 2000 to October 31, 2000. A final judgment of Supreme Court dismissing this claim was entered from which this appeal is now taken.

ation Act of 1993 (OBRA) to "tighten the eligibility requirements for Medicaid" and to curb abusive asset transfers, especially by the elderly (Rosenberg, *Supplemental Needs Trusts for People with Disabilities: The Development of a Private Trust in the Public Interest*, 10 BU Pub Int LJ 91, 127 [2000]). The general rule is that a Medicaid candidate's trust assets are considered "available resources" and count toward determining that candidate's eligibility for state services.

Disability advocates—concerned about the viability of trusts created by parents to provide for their disabled children's futures—lobbied the federal government for protection. One such protection materialized in 42 USC § 1396p (d) (4) (A)—the federal provision at issue here—by striking a balance between the tightened eligibility requirements and the heightened needs of severely disabled individuals who receive a lump sum of money sizeable enough to end their Medicaid eligibility. Section 1396p (d) (4) (A) states that,

> "[a] trust containing the assets of an individual under age 65 who is disabled . . . and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court [and which provides that] *the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual* under a State plan under this subchapter" shall not be considered an "available resource" of the trust beneficiary and shall not impact his or her Medicaid eligibility (emphasis added).

The Medicaid SNT represented "a departure from the rules governing 'available resources,' which would otherwise make a person ineligible for Medicaid" (Rosenberg, 10 BU Pub Int LJ at 132). The New York State Legislature enacted a substantially similar provision in 1994 (*see* Social Services Law § 366 [2] [b] [2] [iii] [A]).

Here, Abraham's parents took advantage of the Medicaid SNT provision in order to shelter the multi-million-dollar settlement he received as a result of the malpractice suit. The SNT agreement states that upon Abraham's death the trust shall terminate and "to the extent then required by law" the trustees must "pay to the State . . . such amount as shall be necessary to provide reimbursement for expenditures made for medical assistance for Abraham [XX.] by the State . . . through Medicaid."

When interpreting a trust agreement we usually rely on the words of the trust itself. Here, however, the trust refers us to the Medicaid statutes.

Pursuant to federal and state law, the State held a remainder interest in all amounts remaining in the trust "up to an amount equal to the total medical assistance paid" (42 USC § 1396p [d] [4] [A]) or "up to the total value of all medical assistance paid" (Social Services Law § 366 [2] [b] [2] [iii] [A]) on behalf of the trust's beneficiary. The question before us is whether "*total medical assistance paid*" is limited by the date of the trust's creation, or whether it extends to the lifetime benefits paid on behalf of the recipient.

Despite the 15 years since the OBRA amendments, we have found limited case law addressing the narrow issue now before us. Thus, we are left with the plain language of the statute and the policy behind its enactment. The words of the statute—though perhaps surprising at first blush—are clear and absolute. When a trust is established pursuant to 42 USC § 1396p (d) (4) (A) or Social Services Law § 366 (2) (b) (2) (iii) (A), the beneficiary explicitly provides the State with a right to recover the *total* Medicaid paid on behalf of that individual. There is no temporal limitation. The sole, though substantial, stated limitation on the State's recovery is the existence of remaining assets in the trust upon the beneficiary's death. If assets are available, according to the words of the statute the State may recover the total amount of benefits paid throughout the beneficiary's lifetime.

This construction advances the underlying purpose of the bargain struck between the SNT beneficiary and the State. The SNT is available only to applicants under the age of 65 with severe disabilities as defined by statute. Unless the applicant placed excess assets in the Medicaid SNT for supplemental care, he or she would no longer be eligible for Medicaid, thus relieving the State of a substantial financial burden. In order to further Medicaid's purpose of providing medical assistance to needy persons, the State agrees to continue paying Medicaid costs—in instances where it would otherwise be relieved of this obligation—in exchange for the *possibility* of reimbursement upon the recipient's death. The State in a sense is like an insurer calculating risk. For every recipient who depletes the trust before death, the State can expect some trusts to have sufficient assets upon a recipient's death to offset the additional cost of continuing Medicaid payments for these severely disabled individuals who

otherwise would be ineligible. Moreover, the State's right to reimbursement occurs only upon the death of the beneficiary—at a time when the life-enhancing purpose of the trust can no longer be effectuated. The Medicaid SNT reflects a policy decision to balance the needs of the severely disabled and the State's need for funds to sustain the system.

Nor do the anti-recovery provisions of the federal and state Medicaid statutes change this result. Kathleen XX. asserts that the terms of the SNT must be modified by Medicaid's anti-recovery provisions. Social Services Law § 369 (2) (b) (i) provides,

> "[n]otwithstanding any inconsistent provision of this chapter or other law, no adjustment or recovery may be made against the property of any individual on account of any medical assistance correctly paid to or on behalf of an individual under this title, except that recoveries must be pursued [in circumstances inapplicable to this case]."

The federal and state statutes are similar, but New York's provision restricts the bar to recovery of correctly paid Medicaid "against the property of any individual" whereas the federal provision restricts the recovery of correctly paid Medicaid without limiting the source of recovery (see 42 USC § 1396p [b] [1] ["No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made"]). All parties agree that the Medicaid paid on behalf of Abraham was "correctly paid." Kathleen XX. argues that the State's recovery of correctly paid Medicaid from the remainder of the trust assets must be limited to Medicaid paid from the date the trust was established. Any further recovery, she argues, would violate the anti-recovery provisions. We disagree.

The anti-recovery provisions are not applicable to the unique context of SNTs created under 42 USC § 1396p (d) (4) (A) or Social Services Law § 366 (2) (b) (2) (iii) (A). The anti-recovery provisions are rules of general applicability for all Medicaid recipients regardless of the severity of disability. The SNT statute, by contrast, specifically addresses the unique and difficult situation faced by severely disabled individuals with assets that are sufficient to end their Medicaid eligibility but insufficient to account for their medical costs. One provision is distinct from the other. There is no need to look beyond the terms of the SNT statute and the terms of the SNT itself.

More compellingly, appellant's construction does not address the anomaly it creates. As stated, no one disputes that the Medicaid paid on behalf of Abraham was correctly paid. That includes Medicaid paid after the establishment of the trust. Therefore, even under appellant's construction, the State will recover correctly paid Medicaid pursuant to the terms of the SNT. While the date of the SNT's establishment may be a convenient limitation of the State's remainder interest, there is no basis in the language of the statutes limiting the State's recovery of correctly paid Medicaid from that date.

Moreover, it should be noted that although the express exceptions do not apply to this case, they are helpful to deciphering the application of SNT reimbursement. Generally, the statutes permit the State to recover correctly paid Medicaid in circumstances where the individual or his dependents will no longer need the resources (*see generally* 42 USC § 1396p [b] [2]; Social Services Law § 369 [2] [b] [i], [ii], [iii]). Here, too, recovery occurs only upon the recipient's death and only if assets remain in the trust.

Finally, appellant argues that the United States Supreme Court's decision in *Arkansas Dept. of Health & Human Servs. v Ahlborn* (547 US 268 [2006]) mandates that the anti-recovery provisions apply in this context. We disagree. In *Ahlborn*, the Supreme Court held that a state's assignment right to "payment for medical care from any third party" (42 USC § 1396k [a] [1] [A]) grants the state a right only to the portion of a judgment or settlement allocated to medical care and not to portions allocated toward lost wages or pain and suffering. In so holding, the Supreme Court added that Arkansas's statute—which permitted the state to recover from the entirety of the settlement—conflicted with the anti-lien provision found in 42 USC § 1396p (a). The anti-lien provision is not at issue in this case and the U.S. Supreme Court expressly declined to address the impact, if any, of the anti-recovery provision in 42 USC § 1396p (b) (*see Ahlborn*, 547 US at 284 n 13). *Ahlborn* did not involve the interpretation of an SNT, or the interpretation of the Medicaid SNT statute, and it is therefore inapplicable to the matter before us.

We recognize that in this case the State would not have been entitled to reimbursement for Medicaid paid from March 24, 1998 through September 12, 1999 had the SNT not been cre-

ated. Equally significant, however, is that Abraham would not have been entitled to receive the benefits of Medicaid throughout his life but for the establishment of the SNT. The language of the statute is plain and clear, and the policy reasons support our interpretation. That the result may sometimes inure to the State's benefit as opposed to the beneficiary's estate is the product of a calculated legislative decision and a calculated choice by the family in setting up the SNT.[4]

We have considered appellant's remaining arguments and conclude that they are without merit.

Accordingly, the judgment appealed from and order of the Appellate Division brought up for review should be affirmed, with costs.

SMITH, J. (dissenting). The federal statute that allows use of a supplemental needs trust (SNT) to preserve Medicaid eligibility provides that, after the beneficiary's death, the State will receive from the SNT "an amount equal to the total medical assistance paid on behalf of the individual" (42 USC § 1396p [d] [4] [A]). The majority reads this to mean "the total medical assistance paid during the individual's lifetime." This is a possible reading, but the words can also be reasonably read to mean "the total medical assistance paid as a result of the SNT," and I think that is the meaning Congress is more likely to have intended. Unless the words are read in that way, a class of disabled people—those who received significant Medicaid payments before they had enough money to fund a trust—will never become SNT beneficiaries, because their families will know that the effect of establishing an SNT will be to impoverish their estates.

---

**4.** As in virtually every matter that reaches our Court, an argument also can be made for the opposite result—and the dissent does so here. We conclude, however, that the better result is to affirm the Appellate Division. First, the best evidence of legislative intent is the words Congress has used in the governing statute. Congress has said that, in exchange for otherwise unavailable Medicaid assistance, an SNT beneficiary must grant the State a remainder interest in the trust assets equal to the "total medical assistance paid on behalf of the individual." The only limitation, if it can be so labeled, is the limitless word "total." Second, Congress's decision to make the SNT available to severely disabled individuals (rather than their families) does not mean it is an appropriate planning tool for every situation—each family must weigh its particular circumstances in receiving the benefits of this tool against its potential disadvantages. Whether the State receives a "windfall"—or nothing—as a result of this bargain, creating the SNT in either event will clearly benefit the severely disabled individual throughout his or her lifetime, which is the very purpose of the law.

The statute defines an SNT as:

"A trust containing the assets of an individual under age 65 who is disabled (as defined in section 1382c (a) (3) of this title) and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter." (42 USC § 1396p [d] [4] [A].)

The law allows the assets of an SNT to be disregarded in determining eligibility for Medicaid, thus producing an unusual situation: a person eligible for Medicaid who is not poor, and may even be very wealthy. Often, as in this case, the wealth is the result of a recovery in a tort action. Congress allows the use of an SNT to preserve Medicaid eligibility for the possessors of such wealth only where the beneficiary of the trust is seriously disabled—if an adult, "unable to engage in any substantial gainful activity," or, if a child, afflicted with "marked and severe functional limitations" (42 USC § 1382c [a] [3] [A], [C] [i]).

The purpose of the statute is "to allow a person with a disability to have an additional source of support during her lifetime" (Rosenberg, *Supplemental Needs Trusts for People With Disabilities: The Development of a Private Trust in the Public Interest*, 10 BU Pub Int LJ 91, 132 [2000]). And since the purpose of the trust is to help the beneficiary, not to enrich his or her heirs, it would not be fair to let the heirs get the assets of the SNT upon the beneficiary's death without reimbursing the State for Medicaid payments. The arrangement may be thought of as a loan—indeed, a commentator has labeled the SNT a "Payback Trust" and "A Bargain for Life" (*id.* at 131). The essence of the bargain is that the State pays Medicaid during the beneficiary's lifetime, and is paid back from anything remaining in the trust after the beneficiary's death.

But what of the beneficiary who was already a Medicaid recipient when he or she was poor—before either the SNT or the assets to fund it existed? This was the situation of Abraham, the beneficiary in this case, for several years before he recovered a large tort award. Most of the Medicaid payments made during that time were recouped by the State through the enforcement of its lien on Abraham's recovery (*see Gold v United Health*

*Servs. Hosps.*, 95 NY2d 683 [2001]), but there remained a period of several months—the period from the date the verdict was rendered to the date it was paid—during which the State paid for Abraham's care and was not reimbursed for it; during that period, Abraham was entitled to Medicaid simply because he needed medical care and did not have any money. No SNT was necessary to make him Medicaid-eligible. The main issue in this case is whether the State can recover some $472,000 in Medicaid payments made during that interval. (Abraham's estate disputes a larger sum, but I would resolve that dispute in the State's favor.)

A similar issue could arise in other cases and involve much larger amounts. Suppose, for example, that an adult who has been a Medicaid recipient all his life, and for whom the State has paid millions, then has an accident resulting in a large tort award—or simply receives a large inheritance. In such a case, the State ordinarily will get none of its Medicaid money back, no matter how immensely rich the former Medicaid recipient has become. With exceptions not relevant here, federal law provides: "No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made" (42 USC § 1396p [b] [1]). In Abraham's case, if no SNT had been created, this statute would prevent the recovery of the $472,000 at issue here.

But under the majority's holding, the creation of an SNT changes the picture, and results in a windfall to the State. Because the majority reads "total medical assistance paid on behalf of the individual" to mean everything paid during the individual's lifetime, the effect of the SNT in the case of the hypothetical adult is to make the unrecoverable millions in Medicaid payments recoverable from the SNT at the beneficiary's death. In practice, this probably will not happen for the simple reason that, if correctly advised, the adult's family will not create an SNT. But surely there is no good reason why that particular disabled person should lose the benefit of a federal statute designed to help people with similar disabilities. I would therefore read the statute in a way consistent with its purpose, taking "total medical assistance paid" to include only the total paid as a result of the SNT's existence—thus effectuating the loan or "payback" that the authors of the statute plainly intended.

The majority says that its construction advances the statutory purpose because it provides the State with a funding source:

"For every recipient who depletes the trust before death, the State can expect some trusts to have sufficient assets upon a recipient's death to offset the additional cost . . . ." (Majority op at 436.) I am unpersuaded, because the State will actually get its windfall only in the exceptional case where a trust is *unforeseeably* left with enough assets to pay back pre-SNT Medicaid. Where that event is foreseeable, and where the pre-SNT Medicaid is substantial, the beneficiary's family simply will not create the trust at all. In a way, it is true that this will benefit the State, because there will be no SNT and no Medicaid payments going forward—but it seems highly unlikely that it was Congress's purpose to benefit the State by deterring the creation of SNTs.

For these reasons, I would reverse the Appellate Division's order.

Judges Ciparick, Read, Pigott and Jones concur with Chief Judge Kaye; Judge Smith dissents and votes to reverse in a separate opinion; Judge Graffeo taking no part.

Judgment appealed from and order of the Appellate Division brought up for review affirmed, with costs.